Parramore Lee SANBORN, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

No. 84–SC–566–MR.

Supreme Court of Kentucky.

June 9, 1988.

J. Vincent Aprile, II, Julie Namkin, Rodney McDaniel, Asst. Public Advocates, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., David A. Smith, Michael Harned, Asst. Attys. Gen., Frankfort, Bruce R. Hamilton, Sp. Asst. Atty. Gen., LaGrange, for appellee.

## OPINION OF THE COURT

The appellant was tried and convicted of intentional murder, first-degree rape, first-degree sodomy, and first-degree kidnapping. The jury imposed a sentence of death for the murder, and a sentence to life imprisonment for each of the other three offenses, and the trial court has entered judgment accordingly.[1] The Commonwealth's evidence proved a particularly vicious and shocking premeditated murder,

---

1. The Brief for Appellant raises sixty-one assignments of error and is 358 pages in length (the "Appendix" and "Reply Brief" not included). This inundating flow threatens to drown out the legitimate arguments, of which there are plenty.

and the death penalty was justified. Nevertheless, in our system an accused has certain minimum guarantees to a fair trial and due process, constitutionally mandated, drawing the line between law and lynching, which apply regardless of the revolting circumstances of the offense. These principles mandate that we reverse for trial error willfully engaged in by the prosecutor, and inexcusably tolerated by the trial judge.

We will undertake in this Opinion to discuss only those errors which individually and cumulatively require that the verdict and judgment be set aside, and such other assignments of error as could become points of contention at a new trial. It would unduly prolong this Opinion, already burdensome in length, to discuss claims which are not error or errors which are unlikely to recur. For instance, the case was tried less than three and a half months from the date of the occurrence, despite its complexity. The defense claims this foreclosed efforts to examine physical evidence and to investigate potential defenses related to mental disease or defect (or even competency to stand trial); that, further, because the trial court refused a change of venue, trial was held precipitately in a small community where the hideous details were still vivid in the minds of the veniremen. Since the convictions must be set aside on other grounds, we need not go into these claims.[2]

The Commonwealth's proof may be summarized as follows. The victim lived with her husband and three children on a farm in Henry County. The appellant was a former employee on this farm. After leaving his employment the appellant was hostile and vindictive towards the family.

On the evening of October 12, 1983, the victim was home with her 11–year old son. Her husband and younger daughter had been hospitalized in Louisville. Her older daughter was away at school. Sometime late that evening the victim was induced to dress hurriedly and drive her car down to the road at the end of her driveway, without awakening her son. Her car was found there the next morning, surrounded by evidence of a vicious attack. A large pool of blood was found several feet from the car. The victim's curlers wrapped with hair were scattered around on the ground and inside the car. Her glasses lay on the ground outside the car. Inside the car there was gory evidence, including bits and pieces of bloody flesh. Her keys were in the ignition, in a partially on position. An umbrella had been jammed inside the driver's door, which could not be forced open.

The Sheriff and other police officials proceeded forthwith to canvass the neighborhood, which included the appellant's home. The appellant was at home and invited the officers in. They noted blood under his cuticles and blood smeared on his pants legs. His shoes, setting near the door, were blood stained, and he had a fresh scratch on his face. There was a large amount of blood on the floor and passenger seat of his car. He was arrested on the basis of this evidence. Several hours later the victim's body was found, partially nude, a few miles from her home.

The victim had died of multiple stab wounds. She had been stabbed nine times, three of which were diagnosed as post-mortem. Her hands showed a number of wounds which likely would have occurred in attempting to defend herself. There was physical evidence found on the body indicating sexual contact had occurred, including vaginal penetration and oral sodomy. The expert testimony about this evidence tied the appellant to these acts.

Laboratory testing established that blood found on the appellant's hands, his knife, shoes, pants, tee shirt and throughout his car, all belonged to the victim. Fibers from the appellant's seat covers and his tee shirt were found on the victim's blouse, underneath her fingernails, and inside her mouth. In turn, fibers from the victim's

2. The time consumed post-trial to prepare the trial transcript and the record, and for briefing, caused a delay of four years before the appeal was ready to be heard on oral argument. Sad to say, this represents the usual in such cases. Precipitate justice and justice delayed are equally reprehensible.

jacket and blouse were found inside the appellant's car.

In addition to the physical evidence, there was considerable witness testimony connecting the appellant to the crime; testimony that a few days before the crime the appellant was talking about "revenge"; testimony that the appellant's car was observed in the victim's driveway both in the afternoon before the crime and that same night; and testimony (of questionable admissibility) about a telephone call from the appellant to the victim.

After his arrest the appellant was interviewed at the courthouse by a police officer and the Commonwealth Attorney. At that time he gave a tape-recorded statement in which he admitted he drove his car to the driveway leading to the victim's home before the crimes occurred, but denied that he was the one who committed the charged offenses. The substance of the appellant's statement was to the effect that there were two others in his car, two brothers whom he refused to identify, and that it was these two other people who "hurt" the victim. In his tape-recorded statement the appellant claimed the reason for his going to the victim's driveway was simply to provide transportation for one of these individuals to talk to the victim, that they then forced the victim into his car, and when he realized they were hurting the victim he stopped his car and ordered them out. The appellant offered no proof to substantiate this alibi. There was no proof of the existence of these two brothers, and there was testimony at trial that an investigation proved they did not exist.

## I. PREJUDICIAL ERRORS

■ There are three prosecutorial errors so substantial that each would require the judgment be reversed.

1) The prosecutor intentionally erased the tape-recorded statements of four witnesses, three of whom testified at trial against the appellant.

The defense had sought by pretrial discovery motion to obtain the statements of prospective witnesses. While this motion was pending, the prosecutor, who was aware of the court's policy to order such disclosure ten or twelve days before trial, erased the tapes. The prosecutor stated on the record, when called upon to produce the tapes:

"They were erased in anticipation of the Court's rulings.... I get what I want off of them, make my notes, and erase them."

The prosecutor claims he has a right to destroy such tapes. The claim is specious, and his tactics unforgivable.

Three of those with tape-recorded interviews testified as witnesses called by the Commonwealth. RCr 7.26(1) states:

"Before a witness called by the Commonwealth testifies, the attorney for the commonwealth shall produce any statement of the witness in the form of a document or recording in its possession which relates to the subject matter of the witness's testimony and which ... is or purports to be a substantially verbatim statement made by him. Such statement shall be made available for examination and use by the defendant."

We need not decide at what point before the witnesses testified the prosecutor should be compelled to produce these tapes. The critical point is the prosecutor made such notes as would assist him in using these persons as witnesses for the prosecution, and then destroyed the tapes, so that these verbatim statements were not available for the defense at any point. This was misconduct of constitutional proportions under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, 219 (1963), and its progeny. *Brady* rules that where the prosecutor "withholds evidence on demand of an accused which, if made available, would [or might] tend to exculpate him or reduce the penalty," such is a violation of due process. *Id.,* 373 U.S. at 87–88, 83 S.Ct. at 1197.

■ These verbatim tapes were as such the "best evidence" of the contents of the witnesses' statements (Lawson, *Kentucky Evidence Law Handbook,* § 7.15 (2d ed. 1984)), and a summary made by the prosecutor before he destroyed them does not

suffice. Prejudice is presumed where the prosecutor destroys evidence. *Hilliard v. Spalding*, 719 F.2d 1443, 1446–47 (9th Cir. 1983). As stated in *United States v. Pollock*, 417 F.Supp. 1332, 1349 (D.Mass.1976):

> "Such action passes beyond the line of tolerable human imperfection and falls into the realm of fundamental unfairness."

In *Pollock*, the court held that such action called for dismissal. However, in this case, the testimony of these witnesses, while important, was not essential to the Commonwealth's case. The relief requested and denied was not dismissal or exclusion, but simply an instruction permitting the jury to draw a favorable inference for the defendant from the destruction of the evidence. Reversal with directions to give the requested instruction is the appropriate remedy. In *State v. Maniccia*, 355 N.W.2d 256, 259 (Iowa App.1984), in similar circumstances, the court held that a missing evidence instruction[3] was sufficient to offset the prosecutor's misconduct. We so hold here.

■ 2) After his arrest the appellant gave a tape-recorded statement to a police officer and the Commonwealth Attorney. Prior to introducing this tape recording, the prosecutor moved for and was permitted, over objection, to furnish his written version of the transcription of this statement to the jury, to assist in listening to the tape. There were approximately 25 instances where the defense disagreed with the Commonwealth's transcribed interpretation of the tape. The Commonwealth Attorney freely conceded that portions of the tape were difficult to understand. He gave this as the reason for furnishing his version of the tape for the jurors' use, when instead it should have been the reason for refusing such use.

For example, on page four of the Commonwealth Attorney's transcript the appellant is quoted as saying "I shouldn't have been wrong." The trial transcript, made by the official court reporter while listening to the tape as it was played in the courtroom, quotes the appellant as stating at this point, "I shouldn't have got drunk."

As stated by defense counsel, "the Commonwealth Attorney's office has interpreted ... the tape in a certain manner, and the Defendant has had absolutely no input into how they would view the interpretation of the tape, and they [the jurors] have before them a printed transcript, which is, in fact, the Commonwealth Attorney's version of the tape." We can but agree with defense counsel's further statement that this procedure "certainly would sway them [the jurors] as to the proper interpretation of the tape."

The trial court's remedy for the problems created by the places in the appellant's tape-recorded statement which were inaudible or difficult to understand, simply made the situation worse. The court's solution was to *highlight with a yellow marker* the Commonwealth Attorney's version of the questionable remarks. It was prejudicial error to enhance the inaudible or unintelligible portions of the defendant's statement with the Commonwealth's written version, and the error was exacerbated by being highlighted with a yellow marker.

■ It is within the discretion of a trial judge to decide whether because portions of a tape are inaudible or indistinct, the entire tape must be excluded. *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir.1983). It is not, however, within the discretion of the court to provide the jury with the prosecutor's version of the inaudible or indistinct portions. The trial court's decision to permit the use of the transcript was an abuse of discretion requiring a reversal of the appellant's conviction. The fact that this transcript was admitted in evidence as a Commonwealth's Exhibit, and was available for the jury to use in its deliberations, compounded the error even further.

---

**3.** *State v. Maniccia, supra,* 355 N.W.2d at 259: "If you find from the evidence that there existed a tape recording ... and that the state intentionally destroyed the tape recording, you may, but are not required to, infer that the information contained on the tape recording would be, if available, adverse to the state and favorable to the defendant."

At oral argument before our Court, in responding to a question, the Commonwealth Attorney passed off this tape to us as the "court's transcript." But the record contains sworn testimony from the Commonwealth Attorney's secretary establishing that this transcript was prepared by her, not the court, and at the direction of the Commonwealth Attorney. That same transcript contains the sworn testimony of the Commonwealth Attorney explaining why he did this, as follows:

"Sanborn is difficult to hear at times, because of the movement of his head and body away from the machine, but you can hear him if you pay close attention, and sometimes have to replay it, but you can pick it up.

Q. 49. Because of that, did you cause a transcript to be made under your direction and supervision of that conversation?

A. I did."

The Commonwealth Attorney was in violation of his duties as an officer of this Court when he represented to us at oral argument that this was a transcript prepared by the trial court.

3) The third error which, standing alone, requires reversal is the extensive use of testimony from three different police officers repeating what was told to them by persons whom they interviewed during the course of their investigation, offered under the guise of a so-called "investigative hearsay" exception to the hearsay rule.

■ Perhaps it would help to state forcefully at the outset that hearsay is no less hearsay because a police officer supplies the evidence. In short, there is no separate rule, as such, which is an investigative hearsay exception to the hearsay rule.

As stated in Lawson's *Kentucky Evidence Law Handbook*, § 8.00 (2d ed. 1984), in distinguishing the "verbal act" doctrine from hearsay, *"[a]n extrajudicial statement has a proper nonhearsay use when its utterance (not its substance) is a part of the issues of the case."* Emphasis original. One example of this which Lawson provides in explaining "a wide variety of miscellaneous situations" where this rule applies is the extrajudicial statement to a police officer offered "not to prove the fact ... but rather to explain the basis for" the action subsequently taken by the police officer. *Manz v. Commonwealth*, Ky., 257 S.W.2d 581 (1953). The fundamental premise underlying the use of such testimony is not the admissibility of "investigative hearsay" but the "verbal act" doctrine:

"This is not hearsay evidence; it is not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place." *Preston v. Commonwealth*, Ky., 406 S.W.2d 398, 401 (1966).

Its relevancy does not turn on whether the information asserted tends to prove or disprove an issue in controversy, but on whether the action taken by the police officer in response to the information that was furnished is an issue in controversy. The information from other persons in the possession of a police officer at the time he makes an arrest is irrelevant to any issue of guilt or innocence in the trial of a criminal case. Such information may become relevant in a criminal case if the legality of the arrest is at issue. It was relevant in *Manz, supra,* because the reason for and legality of the police roadblock was at issue.

Prosecutors should, once and for all, abandon the term "investigative hearsay" as a misnomer, an oxymoron. The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case. Such information is then admissible, not to prove the facts told to the police officer, but only to prove why the police officer then acted as he did. It is admissible *only if* there is an issue about the police officer's action.

Turning to the present case, over objection:

■ 1) Police Trooper Taylor Bright was erroneously permitted to testify about information he received in response to a telephone call he made to investigate the

whereabouts of another potential suspect. He testified that he confirmed the suspect was at work at the critical time.

2) A key witness, Sheriff Ray Powell, was permitted to summarize information from interviews with some forty or fifty persons in the Campbellsburg area by testifying to his conclusion based on these interviews. He testified the two brothers whom the appellant blamed for these crimes did not exist. The substance of Powell's testimony was he did not obtain any information from the people whom he interviewed verifying the appellant's alibi; that he had found no information indicating the appellant "ran with" or had two close friends as he claimed.

3) Detective Robert Perkins, who also investigated the appellant's alibi, was asked whether as a result of his investigation he was led to believe anyone was with the appellant on the night in question, to which he responded, "No, no person at all was seen with Pat Sanborn."

In each of these three examples we are indeed dealing with "investigative hearsay." In each instance the police officer was testifying as to information furnished to him by persons whom he interviewed. The problem is the information was inadmissible because it was hearsay. It was relevant for the truth of what was stated, not for any nonhearsay use to explain the actions of the police officers. The actions taken by the police officers were not at issue.

## II. CUMULATIVE ERRORS

We next discuss errors which would not qualify individually as reversible error, but which cumulatively have that effect.

In some instances, although objected to, taken separately the error is not sufficiently serious to require reversal. In other instances the error is not preserved by sufficient objection.

KRS 532.075(2) mandates that in death penalty cases the Supreme Court shall review "any errors enumerated by way of appeal," and not just those preserved by contemporaneous objection.

"[T]he question of whether objection was made at the trial level is only significant where it may reasonably be inferred that appellant intentionally failed to object for reasons of trial tactics." *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 674 (1984).

Often deciding whether the failure to object was from inadvertence or was a trial tactic presents an imponderable problem. Here, the errors taken collectively mandate reversal, eliminating the need to quibble over individual questions of preservation.

1) We turn first to a laundry list of misconduct engaged in by the prosecutor to inflame the jury against the appellant. The complaints in this regard fall into three categories: (1) a parade of family members utilized as witnesses primarily to elicit sympathy for the victim; (2) unfair comment, demeaning and abusive in nature, calculated to prejudice the appellant and his counsel in the eyes of the jury; and (3) utilizing the local Sheriff, a key witness, as a psychologically intimidating force by keeping the jury in his charge.

■ Our Court has recognized that a certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime; that victims are not mere "statistics." *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 523 (1984). Nevertheless, it is improper for the jury to base its decision on guilt or innocence, or on the appropriate punishment, on who is the victim. *Moore v. Zant*, 722 F.2d 640, 651 (11th Cir.1984), Kravitch, J., concurring. In *Benge v. Commonwealth*, 265 Ky. 503, 97 S.W.2d 54, 56 (1936), we applied this precept, holding the prosecutor had improperly introduced evidence "to show the deceased was a member of the church, did not drink at the time he was killed, but attended church regularly and sang in meeting." We stated:

"It is just as great a crime to kill the most hardened criminal as it is to kill the most upright and illustrious citizen in the land; hence evidence of the good or bad morals of the one slain has no proper place in a trial for murder." *Id.*

And more recently, in *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 675–77 (1984), we condemned introducing evidence where the obvious purpose was "to engender sympathy for the victim and her family."

The principle that conviction and punishment are not contingent upon who was the victim is a difficult concept to explain to the public in the present climate of victim's advocacy. Nevertheless, it is fundamental to our American system of justice and cannot be ignored in individual cases.

In the present case, the victim's husband, son, mother, and two daughters, ages nineteen and seventeen, each in turn were called. The proof included that the victim was "a former Miss Henry County," "a beautiful, attractive, energetic woman," "a mother, and a wife, and a homemaker, and helped run the farm," articles of the victim's clothing introduced bit by bit from these different witnesses occasionally accompanied by crying and sniffling, and a photograph of the victim decorating a wedding or anniversary cake. All this was followed by an impassioned closing argument calling attention to the devastating impact on the family, to which objection was overruled on the grounds that it was "fair comment" on the evidence. Certainly, it was comment on the evidence that had been introduced. The question is, was it "fair"? What are the reasonable limitations on introducing this type of evidence?

■ The answer lies in the rule that in each instance the court must balance the probative value of the evidence (its importance in terms of tending to prove a fact in issue) against its inflammatory nature (undue prejudice to the opposing party), and limit or exclude such evidence where the inflammatory effect clearly outweighs the probative value. *Empire Metal Corporation v. Wohlwender*, Ky., 445 S.W.2d 685 (1969), quoted in *Morrison v. Commonwealth*, Ky., 661 S.W.2d 471, 473 (1983):

"[A]ny remote evidentiary value that the details of the decedent's personal life may have had was far outweighed by the certainty that prejudice to the plaintiff's case in the minds of the jurors would result from the introduction of evidence...." 445 S.W.2d at 688.

In *Nickell v. Commonwealth*, Ky., 565 S.W.2d 145, 147 (1978), we stated that testimony from the deceased's wife, who was not a witness to the murder, "as to when she last saw her husband alive and to the number and ages of her children ... was immaterial and solely designed to play upon the emotions of the jury." So too was much of the testimony of the victim's husband, her three children and her mother, introduced before the jury in this case.

The Commonwealth's modus operandi in the present case exceeded any reasonable limitation. The inflammatory nature of much of this evidence far outweighed its relatively remote evidentiary value to prove facts at issue. The permitted use of such evidence was an abuse of discretion.

In the penalty phase closing argument, the prosecutor renewed his argument to consider the impact of this crime on the victim's family and followed it by reciting "Barbara's favorite poem." In response to a question presented to the prosecutor in oral argument of this case before the Supreme Court, the prosecutor acknowledged that while he was familiar with and liked this poem, there was nothing in the record to indicate the deceased was even aware of its existence. This kind of misconduct must be designated as calculated to deny the accused's right to a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, and Section Eleven of our Kentucky Constitution.

■ 2) The record sustains the appellant's complaint that the prosecutor repeatedly made improper comments of a demeaning nature about defense counsel and the accused. Throughout these proceedings the prosecutor engaged in a considered effort to ridicule and intimidate defense counsel.

Much of this was outside the presence of the jury. While less prejudicial, this would make it no less improper or intimidating. For example, at one point in a suppression hearing defense counsel objected and the prosecutor responded by threatening de-

fense counsel that he would "ram it down your 'damn' throat." At another point during a discovery hearing, defense counsel attempted to assert the right to see certain evidence in the prosecutor's office, and the prosecutor responded "You're not man enough to." During another hearing, at one point the prosecutor stated, "I'd object to everything if I was in their shoes."

At trial the prosecutor made such remarks as:

"I'm tired of being called a liar by a bunch of—."

"If they keep calling me a liar, though, there's going to be something else done. I'm going to destroy evidence on them."

"He's going to pop his gums one more time and—."

While these comments were made at the bench and presumably outside of the hearing of the jury, this is flagrantly inappropriate misconduct plainly calculated to intimidate opposing counsel. No court should tolerate it.

There were other improper comments in the presence of the jury. The record shows that in open court the prosecutor accused defense counsel of the "trick they pulled with that psychiatrist." At another point, within the hearing of the jury, he commented to his adversary, "You tough, ain't you, Receveur." And at another point he accused defense counsel of having "ruined" an exhibit, and when defense counsel protested the accusation, the prosecutor's assistant chimed in "That is a lie, Judge, which she has now told six (6) times."

The record fails to substantiate misconduct on the part of defense counsel justifying this "no holds barred" assault that occurred. The prosecutor's unrelenting attack on defense counsel throughout the trial was grossly improper. A prosecutor "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate." *United States v. Young*, 470 U.S. 1, 9, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 8 (1985).

The litany of prosecutorial misconduct continues:

■ The prosecutor questioned an expert witness called by the defense about his fee, stating: "And that's what you want the court to direct Henry County to pay you?" Such evidence served only to prejudice the jurors, citizens of Henry County, against appellant.

■ The prosecutor improperly defined reasonable doubt to the jury, as prohibited by *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391, 393 (1984).

■ The prosecutor repeatedly suggested in argument to the jury the danger to the community if they "turned this man loose." At one point he stated, "that's the man you want loose in Henry County riding your roads, walking your streets, then that's up to you." And at another point, "[i]t's intentional murder or you turn him loose to live here in Henry and adjoining counties."

This precise misconduct was condemned in *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 676 (1984), and in *Payne v. Commonwealth*, Ky., 623 S.W.2d 867, 870 (1981), our Court stating:

"[N]either the prosecutor, defense counsel, nor the court may make any comment about the consequences of a particular verdict at any time during a criminal trial."

■ At one point the prosecutor argued to the jury that the appellant was hiding behind "secret defenses" because counsel had had an exhibit marked for identification, but not shown to the jury. At two different points in the record the prosecutor suggested to the jury that portions of exhibits which had been deleted on motion of the defense counsel were being unfairly hidden from the jury. In *Moore v. Commonwealth*, Ky., 634 S.W.2d 426, 438 (1982), our Court reversed for similar misconduct.

■ During closing argument the prosecutor vilified the appellant as a "black dog of a night"; and as a "monster"; and as a "coyote that roamed the road at night hunting women to use this knife on"; and as a "wolf." Our Court has "repeatedly condemned arguments in which prosecu-

tors have indulged in vilification and abuse of the defendant." *King v. Commonwealth*, Ky., 253 Ky. 775, 70 S.W.2d 667, 669 (1934). There is no place in argument for scurrilous and degrading terminology. *East v. Commonwealth*, 249 Ky. 46, 60 S.W.2d 137, 140 (1933).

The record is replete with instances where the prosecutor misstated the evidence, and misstated the law relating both to guilt and to punishment. Perhaps the most serious misstatement was the closing argument at the punishment phase where the jury was told that under the law, because of the aggravating circumstances, the jury had a "duty" to pronounce the death penalty:

> "If she died during the engagement of either of those acts [rape or oral sodomy], you have a duty under your oath to return the penalty of death against Parramore Lee Sanborn."

■ The finding of an aggravating circumstance serves only to place a defendant "in the class eligible for the death penalty." *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932, 935 (1986). The jury still has the option of deciding whether the death penalty is appropriate for the particular circumstances of the case, i.e., whether the facts of the case on trial are so aggravated that this particular defendant should be put to death (is "death qualified"). *Zant v. Stephens*, 462 U.S. 862, 872, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235, 247 (1983).

3) Jamie Payton was a key Commonwealth witness who testified to a conversation with the appellant four nights before the crime occurred during which the appellant made threats against the victim's husband and discussed revenge. He also testified to seeing a hunting knife case in the appellant's car. This witness did not come forward until *after* the trial had commenced, and defense counsel sought to impeach him by proving his motive was because he thought the appellant guilty and wanted to assist in proving it. The court stopped this line of questioning, *sua sponte*, stating "I don't want this witness in front of the jury to say, 'I think Mr. Sanborn is guilty.' He can't do it."

■ The appellant had a right to pursue this cross-examination in the circumstances presented. The witness' bias, i.e., what motivated him to come forward after four months of silence, was relevant to the credibility of his testimony. The credibility of a witness' relevant testimony is always at issue, and the trial court may not exclude evidence that impeaches credibility even though such testimony would be inadmissible to prove a substantive issue in the case. In *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the defendant offered evidence that his confession was obtained by sweating. The trial court, finding no coercion, admitted the defendant's confession and then denied the defense permission to offer this evidence as relevant to the credibility of the confession. The Kentucky Supreme Court affirmed (*Crane v. Commonwealth*, Ky., 690 S.W.2d 753 (1985)), but the United States Supreme Court, in a unanimous decision, reversed, stating:

> "The holding below rests on the apparent assumption that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories....
>
> ....
>
> As the Court noted in *Jackson* [*v. Denno*], because 'questions of credibility, whether of a witness or of a confession, are for the jury,' the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." 476 U.S. at 688, 106 S.Ct. at 2145, 90 L.Ed.2d at 643. [Emphasis original.]

■ In the present case the evidence was offered to impeach credibility by showing bias. It was immaterial that the prosecutor would have no right to ask a prosecution witness his opinion as to the defendant's guilt, or that defense counsel would have no right to ask defense witnesses for an opinion as to the defendant's innocence. The testimony was offered as tending to disprove the credibility of previous damag-

ing testimony. As with the abused misnomer, "investigative hearsay," discussed previously, the *purpose* for which testimony is offered is key to its admissibility. Testimony inadmissible for one purpose can be admissible for another. It was so admissible in present circumstances.

■ 4) Before commencing individual voir dire, the trial court read to the prospective jurors, as a group, questions it intended to ask each of them individually when called before the court for questioning. Each juror was then given a copy of the questions. The court's procedure allowed prospective jurors to study and formulate their responses outside the presence of the appellant and his counsel. This procedure violated the appellant's right to be present "at every critical stage of the trial including the impaneling of the jury." RCr 8.28. Additionally, it permitted prospective jurors an opportunity to discuss their responses with one another while awaiting their turn to be questioned by the court.

The court stated that the purpose for doing so was "so that there won't be any hesitation about [the answers] when you come in." This defeats an important function of voir dire.

It is a popular misconception "voir dire" means "to speak the truth." It is instead a French term meaning "to see what they will say." The concept recognizes the critical importance of visually observing prospective jurors while they are formulating answers to voir dire questions. Cutting off this opportunity to observe materially impairs the exercise of the right to challenges. It impairs the fundamental guarantees of the rights of the accused in Section Eleven of the Kentucky Constitution.

While preliminary instructions acquainting the jury with the nature of the judicial process are perfectly proper, providing jurors in advance with specific questions they will be asked so they can prepare in advance to answer such questions is an abuse of voir dire which must not be tolerated.

5) There is also a question in this case as to whether the Commonwealth's comments improperly suggested to the jury that its verdict of death would be only a recommendation, particularly when these comments are considered together with the court's voir dire questions and final instructions. *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985), mandates that it is constitutionally impermissible to minimize the responsibility of the jury in assessing the death penalty. The instructions and comments of court and counsel must never convey to the jury "the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one." *Ice v. Commonwealth, supra,* 667 S.W.2d at 676. In *Ward v. Commonwealth,* Ky., 695 S.W.2d 404, 407–08 (1985), we held that the Commonwealth Attorney committed reversible error in the penalty phase of the trial by repeatedly minimizing the responsibility of the jury in assessing the death penalty, by implying the ultimate responsibility would fall to the trial judge, the Supreme Court, or the Governor.

However, the mandate of the United States Supreme Court in *Caldwell* is not ironclad, and use of the word "recommend" is not *per se* reversible error. *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414, 421 (1986). Since this case is being reversed on other grounds, we need not decide whether such use as occurred here amounted to an abuse. It is sufficient to say that it is borderline at the least, and the court and prosecutor should exercise caution to stay well within the line next time.

6) The local sheriff was a key prosecution witness in this case. Among other things, he provided important testimony covering the investigation at the scene, the introduction of much of the physical evidence, and the lack of any verification for the appellant's pretrial statement made by the appellant claiming he provided the transportation for two brothers who committed the crimes.

The Sheriff was the victim's first-cousin. Unfortunately, he was also related to one of the jurors who tried the case, James Snider. This juror's wife was the sheriff's first-cousin. At one point in the voir dire Juror Snider testified that if there was a

conflict in the evidence, he would "have to lean towards what the Sheriff might say." Juror Snider should have been excused for cause, but he was not. It is questionable whether this error is properly preserved because the issue was first raised on motion for a new trial. The appellant claims if this issue was not sufficiently preserved, it should be reviewed anyway under KRS 532.075(2).

Juror Snider should have been excused for cause under authority of *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221 (1958). *Pennington* held that a juror who was on a first-cousin basis with the prosecution's key witness should have been excused for cause, even though he disclaimed any bias, because "[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause." *Id.*, at 224.

The definition of what constitutes a "close relationship" requiring a juror to be dismissed for cause is not clear. Ordinarily it is within the discretion of the trial court as to whether to excuse a first-cousin by affinity. Such is not the case here where there were further answers showing a probability of bias toward the testimony. Recently, in *Marsch v. Commonwealth*, Ky., 743 S.W.2d 830, 833 (1988), we held the trial court erred in failing to excuse for cause prospective jurors who were married to persons who were second or third cousins of the victim, where, as here, there were additional circumstances implying bias.

As is often the case with a mistake of this nature, subsequent events compounded the problem. The sheriff, after being a witness, was put in charge of the jury when the jury was sequestered. Defense counsel objected to no avail, complaining of the "unspoken influence that his presence may have upon them in the course of their deliberations in ... such a serious case." Then, when the jury went out to deliberate upon the death penalty, it was the sheriff who took the instructions into the jury room, and, when the jury finished deliberating, it was the sheriff who informed the court the jury had

reached a verdict, and who returned the jury to the courtroom. Placing the jury in the custody of this sheriff, who had been an important prosecution witness, at key stages of these proceedings violated the principle of separation of witnesses. *See Turner v. Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424, 429 (1965), wherein the United States Supreme Court stated in similar circumstances:

"And even if it could be assumed that the deputies [who were witnesses] never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." *Id.*

In the present case the sheriff was not only a key witness, but also a first cousin of the victim and a first cousin by affinity to Juror Snider. The situation that existed when he was placed in charge of and in contact with the jury exudes the appearance of prejudice.

There was still one more factor compounding the appearance of prejudice. At the crucial phase of the trial where the jury was to consider the death penalty, this same Juror Snider was informed of his father's unexpected death. The day before his father's death, Snider's wife was hospitalized. In spite of these personal disasters, Juror Snider expressed a willingness "to carry on with the trial," and was permitted to do so over defense objections. Given the combination of circumstances discussed above, the relationship to the sheriff who was a key witness and the person in charge of the jury, the appearance of impropriety in the continued presence of Juror Snider on the jury in these circumstances amounts to a denial of a fair trial.

*Baker v. Commonwealth*, 280 Ky. 165, 132 S.W.2d 766 (1939), cited by the Commonwealth as authority to the contrary, is inapposite. In *Baker*, the accused (not the Commonwealth) wished the jury's deliberations to continue despite the death of a

family member. In present circumstances it is unreasonable to believe that the juror could dispassionately concentrate on the deliberative process, or indeed that the continued presence of Juror Snider on the jury would not skew the mind-set of other jurors. Other jurors openly expressed sympathy with his plight and agreed to do whatever Snider needed to do. In *Cherry v. Director, State Bd. of Corrections*, 635 F.2d 414, 420 (5th Cir.1981), in circumstances much less serious than the present, the court held that it was appropriate to declare a mistrial. In present circumstances, considering all that had gone before, to do otherwise was an abuse of discretion.

7) The trial court refused to permit cross-examination of a witness for the Commonwealth to bring out that he was on active probation for second-degree wanton endangerment at the time of trial. This was a witness who testified he saw the appellant's car at the driveway to the victim's residence on the day of the crime. The trial court denied this cross-examination for reason the offense did not qualify as a conviction of a felony. However, this type of cross-examination was proper under authority of *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347, 353–54 (1974), because proof that a witness is on active probation is admissible to show the "witness' motivation in testifying." Such cross-examination "is a proper and important function of the constitutionally protected right of cross-examination," and included within the defendant's right to discredit a witness by revealing "possible biases, prejudices, or ulterior motives of the witness."

8) At the penalty phase, on the pretext of rebutting a casual comment by a defense witness to the effect that the appellant was "a peace lover," the Commonwealth called to the stand the appellant's ex-wife and step-daughter, who gave highly inflammatory detailed testimony about uncharged crimes allegedly committed against them, involving assault upon family members and rape of the step-daughter. The defense witness' brief and unresponsive comment did not open the door to the storm of evidence that followed.

As stated in *Jones on Evidence*, Vol. 4, § 24.1 (6th ed. 1972), "rebutting evidence means ... evidence in denial of some affirmative fact which the answering party has endeavored to prove." The general rule is that a witness who has testified to the good character of a party may be asked on cross-examination "if he has not heard that the party has done this or that; but proof may not be made by other witnesses in rebuttal that the party had done the things in question." *Etherton v. Commonwealth*, 246 Ky. 553, 55 S.W.2d 343, 347 (1932).

In presenting the testimony of the ex-wife and step-daughter the Commonwealth violated this rule; indeed, abused it in a shocking manner. A number of cases have been reversed because the Commonwealth far exceeded appropriate rebuttal in this respect: *Rose v. Commonwealth*, 286 Ky. 53, 149 S.W.2d 772, 774 (1941); *Shell v. Commonwealth*, 245 Ky. 223, 53 S.W.2d 524, 528 (1932); and *Warner v. Commonwealth*, Ky., 621 S.W.2d 22, 26–27 (1981); are examples. The abuse of the appropriate limitations on such rebuttal testimony in the present case went far beyond the *Rose, Shell* and *Warner* cases.

9) The trial court erred in the jury selection procedures, in that the judge excused a number of prospective jurors without recording a reason for the excuses on the jury qualification form. This violated KRS 29A.080, 29A.100(2), and the Administrative Procedures of the Court of Justice, § 14(2). The trial court later gave reasons as to why these jurors were excused, but this subsequent explanation is no substitute for contemporaneous compliance with the statutory rules. The reason behind such rules is to insure selection of an impartial jury. In *Ice v. Commonwealth, supra*, 667 S.W.2d at 683 (Leibson, J., concurring), we criticized a similar dereliction. Once again we emphasize the importance of substantial compliance with jury selection procedures mandated in an effort to provide an impartial jury.

■ 10) Finally, there was improper *ex parte* communication between the prosecutor and the court. During the penalty phase, the trial court granted an *ex parte* motion for an order compelling the attendance of the appellant's ex-wife as a witness. The Commonwealth argues this *ex parte* conference was proper because a subpoena may be obtained *ex parte* from the *clerk* of the court *before* trial. But this does not excuse obtaining an *ex parte* order from the *judge* of the court *after* trial has commenced. Then, *every order requested of the court* is a matter to be addressed in the *presence of opposing counsel.* It is a "dangerous procedure" and a "gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court." *Haller v. Robbins,* 409 F.2d 857, 859 (1st Cir.1969).

### III. POTENTIAL ERRORS IN THE INSTRUCTIONS TO BE AVOIDED UPON A RETRIAL

There were no reversible errors in the instructions that were properly preserved by objection. Nevertheless, there were a number of questions raised on appeal which need to be addressed in order to avoid error in the giving of instructions at a subsequent trial.

The primary theory of the defense at trial was that the victim was stabbed to death in her driveway and then transported to Martini Lane where the alleged sexual offenses occurred. Obviously, this theory does not square with the accused's pretrial statement indicating that the victim was alive when he put her out of the car. But it does square with some of the physical evidence suggesting that the victim was mortally wounded before her clothing was removed, and with so much of the accused's exculpatory statement as claimed that no sexual offenses had yet occurred at the point where he put the two brothers and the deceased out of the car because they were fighting. If the jury believed this theory, or if the jury concluded that the Commonwealth had failed to prove the contrary beyond a reasonable doubt, the defense theory negated conviction for kid-napping, rape, and sodomy, and foreclosed the aggravating circumstances necessary to inflict the death penalty.

In closing argument the prosecutor understandably ridiculed this defense. However, at one point the prosecutor went too far, arguing that the appellant was just as guilty if he murdered the victim and then had sexual relations with her, and just as deserving in punishment. Obviously, a defense of this nature is a difficult one, hardly appealing to lay jurors' sense of justice.

Defense counsel argued for an instruction on the crime of abuse of a corpse, as appropriate for submitting the defendant's theory. This was based on the Commentary (1974) to KRS Chapter 510, which states:

"This chapter does not penalize sexual intercourse or deviate sexual intercourse with [a] ... dead human body.... If a prosecution for this sort of activity is necessary, it can be brought under abuse of a corpse...." *See* also Commentary (1974) to KRS 525.120.

Counsel argued that the kidnapping, rape, and sodomy statutes all used the term "person," which means a living, breathing, human being. Although the trial court refused to instruct on abuse of a corpse, the court did find sufficient merit in defense counsel's argument to insert the words "a person" after the victim's name in the instructions, and to define a "person" as "a living, human being."

The general rule is that "the court is required to instruct on every state of the case reasonably deducible from the evidence." *Ragland v. Commonwealth,* Ky., 421 S.W.2d 79, 81 (1967). And, a "defendant is entitled to have his theory of the case submitted to the jury." *Davis v. Commonwealth,* Ky., 252 S.W.2d 9, 10 (1952).

■ Where the evidence is such that the jury could come to any of several conclusions, the trial court is required to submit the instructions on the various alternatives. *Pace v. Commonwealth,* Ky., 561 S.W.2d 664, 667 (1978). The right to instructions embodying an alternative offense, which is the defendant's theory of

the case, is not accommodated by an instruction that the defendant will be found not guilty if the Commonwealth has failed to prove the offense charged in the indictment beyond a reasonable doubt. Sanborn could hardly expect the jury to exonerate him in the face of his criminal misconduct, and this was the reason why his counsel requested instructions on a crime that presented a middle ground between the offense more severely punished and acquittal.

■ It is fundamental that in a criminal case it is the duty of the court "by the instructions to give to the accused the opportunity for the jury to determine the merits of any lawful defense which he has." *Curtis v. Commonwealth*, 169 Ky. 727, 184 S.W. 1105, 1107 (1916). As stated in *Brown v. Commonwealth*, Ky., 555 S.W. 2d 252, 257 (1977):

> "Whether one is referring to one of [the] affirmative 'defenses' [in the criminal code] or to a lesser offense, the evidentiary situation and burden of proof are the same. Evidence suggesting that a defendant was guilty of a lesser offense is, in fact and in principle, a defense against the higher charge, though it is not a 'defense' within the technical meaning of that term as used in the Kentucky Penal Code, *cf.*, KRS 500.070."

In one sense it may appear a misnomer to refer to the situation that exists when an accused admits to a state of facts that constitutes a criminal offense, while denying further facts that constitute a more serious offense, as a "defense." But by doing so the accused defends against the principal charge. As stated in Palmore, *Kentucky Instructions to Juries*, § 1.06 (Supp.1979):

> "Although the opinions usually speak in terms of 'evidence' that is 'sufficient' to call for an instruction on a lower degree, it should be clearly recognized that quite often the basis for such an instruction will be some deficiency in the proof pertaining to an essential element of the crime that differentiates the higher from the lower degree. This may result (a) from a mere weakness in the Common-

wealth's evidence or (b) from countervailing evidence that is sufficient to raise a reasonable doubt with respect to the element in question."

The appellant's theory of the case was that the kidnapping, and in particular the sex offenses, were committed after the victim was already dead. If at the next trial there is any substantial evidence to support this theory, the appellant will be entitled upon request to instructions accordingly, rather than the jury being left with no alternative except to convict or acquit of the principal charges.

■ Next, the appellant argues instructions should have been given on wanton murder, second-degree manslaughter and reckless homicide, premised upon his tape-recorded statement to the effect that he did not commit the murder, but instead simply assisted the two men who did. No instructions were requested in this regard at the trial, and the error, if any, in failing to give such instructions is not preserved. Nevertheless, at the next trial, under the same hypotheses as premised above, if the appellant requests instructions on this theory, the giving of such instructions must be considered.

The within case is reversed and remanded for a new trial in conformity with this opinion.

STEPHENS, C.J., and LAMBERT and LEIBSON, JJ., concur.

GANT and VANCE, JJ., concur in results only.

WINTERSHEIMER, J., dissents by separate opinion in which STEPHENSON, J., joins.

WINTERSHEIMER, Justice, dissenting.

I respectfully but strongly dissent from the majority opinion because the defendant received a fundamentally fair trial and the alleged errors complained of by the majority did not prejudice the verdict of the jury.

The majority decision is a tragic triumph of the so-called system over substance. Every defendant is entitled to a fair trial,

but not a textbook perfect one. *See Brown v. United States*, 411 U.S. 223, 98 S.Ct. 1565, 36 L.Ed.2d 208 (1973). A careful and exhaustive evaluation of the record indicates that the principles of law, order and justice which govern our society do not indicate that the so-called trial errors require a reversal of this conviction. The noble language of the majority must be tested in the light of the totality of the situation and the response of existing law in similar circumstances. Certainly, any accused must be afforded procedural protections, but in a context of reality and not second-hand fantasy. There is no basis for reversal here.

The majority maintains that there are three prosecutorial errors so substantial that each standing alone would require reversal. I disagree on the basis of an analysis of the majority rationale when measured against the facts.

1. The erasure of tape recorded interviews of three witnesses by the prosecutor did not deprive the defendant of due process. The defendant had sufficient opportunity to cross-examine the witnesses concerning the content of any pretrial statements they had given but did not do so. An aggrieved party must exhaust all reasonably available means to have the claimed error corrected before he can demand other relief. *Cf. Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985); *Romans v. Commonwealth*, Ky., 547 S.W. 2d 128 (1977). There is no contention that the evidence might have contained exculpatory material which would require a new trial.

In any event, any possible error is entirely harmless. The three witnesses were not material, and the other evidence of guilt was overwhelming. The three witnesses testified about the defendant's drinking in the afternoon and gave cumulative testimony about the knife and his employment. The other witness was merely the defendant's landlady and the third stated that he saw the defendant driving in the area on the night in question. I do not believe there would be any difference in the ultimate outcome if all the technical require-

ments now raised by the majority were adhered to. The failure to comply with RCr 7.26 does not require automatic and absolute reversal. *McRay v. Commonwealth*, Ky.App., 675 S.W.2d 397 (1984).

The real thrust of the majority is that there was prosecutorial misconduct of constitutional dimension under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 215 (1963) and its progeny. I disagree because the majority now posits a shrewdly constructed rule on a very shaky syllogism of the Supreme Court case elevated by a Federal circuit court opinion and finally by a district court decision. I believe this is flawed logic. *Brady, supra*, held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material. Here there is no showing that the suppressed tapes contain material evidence which would be favorable to the defendant as to guilt. In *Hilliard v. Spalding*, 719 F.2d 1443 (9th Cir.1983), a colorable claim was raised that the prosecution suppressed evidence relative to an earlier rape conviction. Although the tapes were erased, Sanborn could have cross-examined the witnesses on the content of their statements and determined if it would have aided in his defense. Sanborn had a sufficient opportunity to discover the content of the statements which is different from the destruction of a sperm sample in *Hilliard, supra*, which made it impossible for the defendant to discover its content.

*United States v. Pollock*, 417 F.Supp. 1332 (D.C.Mass.1976) involved the falsifying of a document as to the time of its preparation and the notes used to prepare the document were destroyed. If the testimony of the witnesses was not material to the defendant's guilt or innocence, the holding in *Pollock, supra*, and *Brady, supra*, do not apply. *State v. Maniccia*, 355 N.W.2d 256, 259 (Iowa App.1984) likewise does not apply to this situation. *Maniccia, supra*, cites *State v. Brown*, 337 N.W.2d 507, 510 (Iowa 1983), stating that "Where evidence is material and there is the 'unavoidable possibility that the [evidence] might have significantly favored the accused,' denial of access to the evidence is a

denial of due process." The *Maniccia* court went on to state that, "Evidence is material if it is offered to prove a proposition which is a matter in issue or is probative of the matter in issue." In *Maniccia* the tape destroyed was a recording of a conversation which occurred during an alleged cocaine transaction. Such evidence was clearly material and might have been favorable to the defendant. There is no such showing of materiality or the possibility of favorableness to Sanborn in this case. Therefore the carefully woven web of the majority is easily pierced. The legal basis for finding that the erased tapes constitutes reversible error is totally without merit.

*Ford v. Commonwealth*, Ky., 665 S.W. 2d 304 (1983), held that the unnecessary destruction of blood samples did not violate the due process requirements in the absence of a showing that such evidence had exculpatory value. The evidence must possess an exculpatory value that was apparent before it was destroyed and that it must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

2. The method of the trial court's solution of the highlighting of the dispute over the written transcript does not merit reversing. The defendant has the opportunity to bring to the attention of the jury where he thought the transcript was in error. The trial court admonished the jury that the transcript was intended only as a listening aid and that the highlighted parts were areas where the transcript might be inaccurate and that any conflicts with the transcript should be resolved in favor of what they heard on the tape. The use of a transcript is within the sound discretion of the trial judge. In *United States v. Robinson*, 707 F.2d 872 (6th Cir.1983), the Court of Appeals endorsed an instruction as adequate which was very similar to the admonition in this case. The *Robinson* court did hold that if the tape is clear enough for a juror to detect that the tape is at variance with the transcript and where the tape is partially inaudible the likelihood is that the

transcript becomes the evidence. However, in *Robinson* the tapes were relied on very heavily by the prosecution. Here the tapes lacked materiality at least in regard to the inaudible portions. The portions inaudible which were highlighted were not prejudicial and there was sufficient other evidence to support the conviction. Any error is harmless. If the prosecutor was in violation of any of his duties in anything he did in connection with this or any other representations, then *Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218 (1976), should cover this situation. In that case, the prosecutor was criticized but the conviction was upheld.

3. The majority labels the police testimony investigative hearsay and inveighs against it, expounding a legal philosophy which distracts attention from the actual situation. The police were reporting on what they had learned as a result of their investigation, not for the truth of the individual statements but for the fact of statistical information and the scope of the report. The police were available for cross-examination and the defendant was not prejudiced. The evidence of information acted upon by investigating officers was admissible. It was not admitted for the purpose of proving the truth of what was said but to describe the relevant details of what occurred. *Preston v. Commonwealth*, Ky., 406 S.W.2d 398 (1966).

Sanborn gave police a tape-recorded statement stating that he drove the getaway car for two other people who actually committed all the crimes. He described these anonymous individuals as brothers one of whom resided in Campbellsburg and the other in LaGrange. The Sheriff testified that he interviewed 40 to 50 people in an unsuccessful effort to locate the brothers. At a certain point, he stopped recording the names of his interviewees. Another officer also tried to locate the phantom brothers. He testified that none of the witnesses had seen Sanborn with another person that night. The defendant believes that defense counsel should have the opportunity to examine the 50 or so persons involved. If this request were granted, the

trial could have taken two years rather than just two months.

All of the officers were acting on information they had received. The state police officer had eliminated one suspect by his investigation. The Sheriff was following the defendant's lead by canvassing the community. The detective summarized the testimony of witnesses who had already appeared at trial. None of the witnesses had been able to discover the existence of the two brothers.

There is no Kentucky case which gives us any assistance in deciding this type of issue. However, other jurisdictions have considered this matter and have determined that the testimony of police officers investigating the existence of "nonpersons" is admissible.

*Thomas v. State*, 54 Okla.Cr. 97, 98–99, 14 P.2d 953, 954 (1932), is similar in that a deputy sheriff testified concerning his inquiry about the existence of a certain person. The Oklahoma court stated, "That there are certain matters which cannot always be proven by positive testimony." It is not always possible to produce a witness who can testify that there is no such person.

The substance of the witness' testimony is that in his opinion no such person exists; his opinion is based on the fact that he made inquiry. Testimony of the nonexistence of a claimed person is a matter of opinion which may be based on what is usually termed hearsay. Such testimony is not strictly speaking hearsay, but circumstantial evidence tending to prove that the claimed individual had no existence in fact.

*State v. Kern*, Iowa, 307 N.W.2d 22, 26 (1981), adopted the view of the Oklahoma court.

The Supreme Court of Delaware also followed the *Thomas v. State* analysis in *Dutton v. State*, 452 A.2d 127 (Del.Supr.1982), stating that the majority of cases dealing with negative results from inquiries appear to allow such evidence of inability of the inquirer to find after a diligent search and this is circumstantial evidence of the nonexistence of the fact in question.

McCormick on Evidence § 250 at 743–44 (3rd ed. E. Cleary 1984) states that, "It is true that the residents of whom inquiry was made could be brought in to testify as to their lack of knowledge but only at the price of substantial inconvenience and loss of time. However, application of the hearsay definition yields a satisfactory avoidance of the hearsay argument. The question asked would in essence have been, "Do you know, or have you ever heard of, a person named ... in this community?" with the answer "No." "The assertion in the answer is that the declarant has not heard of the person, but the inference suggested from the aggregate of the answers is not that the declarant had not heard of such a person, but rather such a person does not exist."

The majority opinion will add a greater unnecessary burden to the prosecutor's already difficult task of proving a negative, the nonexistence of a person.

We must now turn to what the majority describes as cumulative errors which require reversal. This Court is required to review every claimed error in a death penalty case. That does not mean we are obliged to reverse a jury decision because of harmless error. The majority admits that the so-called cumulative errors are in many cases not preserved and in others not sufficiently serious to require reversal. In regard to the alleged prosecutorial misconduct, nearly half of the arguments presented were not properly preserved for appellate review. Nonetheless any such alleged errors should be reviewed. It should be recognized that in a two-month trial there can be mistakes and omissions by all parties. Consequently the rule that in a death penalty situation all errors should be reviewed has value.

The prosecutor's statements regarding the fact that the victim was a living human being and had a family, although very dramatic in presentation, did not unduly inflame the jury. The majority opinion itself describes the evidence here as proving a particularly vicious and shocking premeditated murder. The prosecutor had no need

to inflame the jury. It was the fact of the murder that produced the verdict.

The prosecutor's behavior towards defense counsel does not amount to prosecutorial misconduct which would be prejudicial to the defendant. Most of the complained of comments were made outside the hearing of the jury. Actually, both counsel exchanged rather rough remarks about each other. None of these exchanges affected the outcome. *Cf. United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Even taken at its best, the majority opinion refers to items discussed during closing argument at the penalty phase. Any error in that regard would relate only to that phase.

The trial judge read prospective jurors questions it intended to ask each individually. Neither the defendant nor the majority can cite authority that this procedure was error. The scope of jury inquiry is best governed by the wise and liberal discretion of the trial judge. The exercise of such discretion does not constitute reversible error unless clearly abused and when it appears that harmful prejudice has been caused thereby. *Webb v. Commonwealth*, Ky., 314 S.W.2d 543 (1958). That is not the case in this situation.

The conduct of the county sheriff was not reversible error. The question of whether to exclude a juror on the basis of close relationship is ordinarily within the sound discretion of the trial judge. Here there is no abuse of that discretion. The same is true in regard to the question of separation of witnesses and jurors. *Turner v. Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), deals with a continuous and intimate association as distinguished from a brief encounter with jurors. Here the sheriff was at the motel where the jury was sequestered on the night prior to the giving of instructions on the guilt phase. He was also present during the penalty phase deliberations. He had no direct contact with any of the jurors. There is no basis for complaint. The refusal of the trial judge to excuse juror Snyder because of the death in his family, is not reversible error. The juror did not wish to be excused. This Court is not bound by the majority citation to a federal circuit court in *Cherry v. Director, State Bd. of Corrections*, 635 F.2d 414 (5th Cir. 1981).

The refusal to permit cross-examination of a prosecution witness about his probation statute was not error. A misdemeanor conviction for wanton endangerment has never been admissible to impeach the credibility of a witness. *Cotton v. Commonwealth*, Ky., 454 S.W.2d 698 (1970). The reliance by the majority on *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is strained. The witness in this case is not on probation for the same type offense, he was not a suspect, his testimony was not evasive and he was not a material witness.

The other assignments of alleged error are not significant enough even when viewed as cumulative to require reversal.

This Court has previously unanimously determined that the nonprejudicial error or harmless error rule applies in death penalty cases. *Stanford v. Commonwealth*, Ky., 734 S.W.2d 781 (1987). The jury could not ignore the abundant physical evidence relating to the defendant's guilt. The error so earnestly urged by the majority is harmless beyond any reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Nothing could have changed the result in this case and nothing could have added much fuel to the fire. *Timmons v. Commonwealth*, Ky., 555 S.W.2d 234 (1977). The result in this case will not be any different upon an ultimate retrial. Considering the entire case there is no substantial possibility that the result would be any different and the alleged errors are clearly nonprejudicial. RCr 9.24; *Abernathy v. Commonwealth*, Ky., 439 S.W.2d 949 (1969).

I would affirm the conviction.

STEPHENSON, J., joins in this dissent.