**James Howard TIMMONS, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

Supreme Court of Kentucky.

May 20, 1977.

Rehearing Denied Oct. 7, 1977.

Jack Emory Farley, Public Defender, William M. Radigan, Asst. Public Defender, Commonwealth of Kentucky, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Raymond M. Larson, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

James Howard Timmons appeals from judgments entered pursuant to a verdict finding him guilty of first-degree unlawful imprisonment (KRS 509.020) and murder (KRS 507.020) and fixing his punishment at five years' imprisonment and life imprisonment, respectively. The two charges were tried together.

The case arose out of the abduction and death of a three-year-old boy named Eddy Belt.

Timmons did not testify, and except for the abduction of the little boy the evidence against him was entirely circumstantial. Shortly after 6:00 P.M. on June 19, 1975, Timmons borrowed his brother's girl-friend's automobile and drove to the parking area of a municipal housing complex in Paducah, Kentucky, called Elmwood Court. Eddy Belt and Victoria Copeland, eight years of age, got in the front seat with him, and he made sexual overtures toward them. He told Victoria that she was "his girl," took down her panties, and exposed his genitals to her. He asked Eddy to unzip his pants and get his penis out, which Eddy did. At some time before 7:00 P.M. he drove off, taking Eddy with him. He brought the automobile back to his brother's place at about 9:15 P.M. Meanwhile, the indecent-exposure incident had been reported to the police and a search for Eddy was undertaken. Five days later, on June 24, a fisherman discovered the child's body on the bank of the Ohio River near the water's edge in a brushy, wooded area called the "Duck's Nest" just outside the Paducah floodwall. He had been dead for several days, and the body was so badly decomposed that it could not be ascertained with absolute certainty whether he had been subjected to foul play. The cause of death was drowning.

A post-mortem examination disclosed a laceration over the right eye down to the bone, probably caused by a blunt force of some kind. There were three lacerations on the back and three on the right buttock. The lacerations on the buttock penetrated through the skin to the underlying muscular tissue. There was also an elongated laceration next to the anus which extended into the rectum. It could have occurred prior to death, and there is a remote possibility that it could have been caused by a man's penis. It could also have been caused by a combination of tissual decomposition and the pressure of a tremendous internal accumulation of gas. More significantly, the child's penis showed evidence of bleeding into the tissues, indicative of a pre-mortem injury, and although this could very well have resulted from an injury at an earlier time in his life, there was no evi-

dence that he ever had sustained such an injury.

Timmons was familiar with the Duck's Nest. In the middle of the afternoon of June 19, 1975, a witness named Crochett, who had gone there to swim, saw and spoke with him, though his identification was not absolutely positive because at that time Timmons was wearing a beard whereas at the trial he was clean-shaven. Another witness, Allen Bolte, who lived at Elmwood Court, said that between 6:30 and 7:00 P.M. on June 19, 1975, Timmons came to Bolte's apartment looking for his girl-friend Ila Warren, also a resident of Elmwood Court, and told Bolte he had been fishing at the Duck's Nest during the past two or three days. During this conversation Timmons asked Bolte and Bolte's nephew to go fishing with him there, but they declined and Timmons left. Ila Warren's nephew, Richard Dixon, a teen-age boy, testified that within a week before June 19, 1975, he and Timmons had gone to the Duck's Nest in Ila's automobile and that while they were there Timmons took out his penis and asked Richard to look at it, which he refused to do. Leaving the Duck's Nest, they drove across the Tennessee River to a dump area in Livingston County, where Timmons proceeded to suggest that they engage in oral sex, telling Richard that they did all that stuff when he was in the penitentiary.

A police search for both Timmons and Eddy Belt began within minutes after they were seen leaving Elmwood Court. Timmons had been staying with Ila Warren but had moved out some three weeks before, after which he had been sleeping in an automobile outside an apartment occupied by his brother and Carol Evans, the owner of the car. This was the vehicle Timmons borrowed on June 19, 1975. After returning it around 9:15 P.M. Timmons gathered up his clothes and departed on foot. His brother did not see him thereafter, and did not know his whereabouts until an F.B.I. agent apprehended and arrested him in Illinois on September 1, 1975. Lest we convey the impression, however, that the evidence suggested no explanation for the flight and self-concealment of Timmons other than his guilt with respect to the fate of Eddy Belt, it should be noted that during all of this time he was a fugitive from an out-of-state prison and that Carol Evans, who would not let him stay in the apartment with her and his brother, was upset over his having borrowed her car while she was away at work on June 19, 1975.

█ A principal argument in behalf of Timmons is that the evidence was insufficient to establish the corpus delicti—to wit, that it was not enough to justify reasonable minds in concluding beyond a reasonable doubt that the child's death resulted from a criminal act. We do not agree. A sex-degenerate whose proven purpose is to engage in lascivious activities with a small child, spirits that child away from home, and later the child is found dead in a secluded area. Perhaps, indeed, he is never found at all, but we need not consider what inferences might reasonably be drawn in that case. In any event, when it is determined that the death resulted from drowning, or from some other form of suffocation, common sense suggests a definite probability that in one way or another it was brought about by the abductor. The killing of an infant victim by a sex-fiend in order to shut his mouth happens with too great a frequency for the general public not to see it as a familiar modus operandi. It is quite enough that no inference of guilt may be drawn from a defendant's silence. His constitutional protection in that respect does not extend to conclusions that may reasonably be drawn from evidence that in the absence of any other explanation points the finger of guilt directly at him.

█ We do not dispute the proposition that the proof of each essential element of a crime, including the corpus delicti, must be sufficient to justify reasonable minds in finding its existence beyond a reasonable doubt. When the evidence bearing on one particular element is circumstantial, as it was in this instance, not only is it necessary, but reasonable and customary, to resort to the evidence as a whole for an assessment of the probabilities. That which a jury may

reasonably believe to have been probable is enough to support a finding of guilt under the reasonable-doubt standard. It is not necessary that the evidence exclude other possibilities. What the law requires is probability, which has been defined as more likely than not, cf. *Fields v. Western Kentucky Gas Company*, Ky., 478 S.W.2d 20, 22 (1972). In this specific case we think the evidence raised a very strong likelihood that Eddy Belt came to his death at the hands of James Howard Timmons, but even if we had misgivings on that score, as an appellate court we certainly cannot say that a jury could not reasonably believe so. Cf. *Perry v. Commonwealth*, Ky., 514 S.W.2d 202, 204 (1974); *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530 (1977).

■ In addition to the evidence of Timmons' criminal conduct toward the children at Elmwood Court and Richard Dixon's account of his overtures at the Duck's Nest and then at the dump in Livingston County, the trial court permitted the Commonwealth to read the following excerpt from a handwritten notebook found in Timmons' pocket when he was arrested:

"I just found out yesterday that kids was going to school now. I don't no how long they have been open up again. Now wood be a good time to get some school pussy. Find a girl waiting for the school bus that is out of sight of her house. Keep her all day. Let her go about dark. That way I wood have all night to travel on to some other part of the country. Let some one know where I be so they can get me food and ice water. They say Hell I no he didn't rape the girl for he was hid out in the woods. The girl was raped 35 miles away. He could be at 2 places at the same time."

Immediately following the reception of each of these items of testimony the court admonished the jury not to consider it as bearing on the guilt or innocence of the defendant, but only as it might show a plan, scheme or pattern or, in the instance of the written material, "any disposition or intent of the defendant as to his lustful inclinations, his motive and any behavior pattern, any scheme or any plan that he may have or had, if it does that."

Timmons contends that all of this evidence was inadmissible and that he was doubly prejudiced by the prosecutor's effective use of it in his summation to the jury. Counsel concedes that when there is evidence of a sexual offense this kind of testimony is admissible for the limited purposes stated in the admonitions given to the jury, but again, as with the argument on corpus delicti, he takes the myopic view that there was no evidence that Timmons committed any sexual offense with the child, hence there was no basis for admitting other proof of his sexual proclivities. And again our reaction is the same as it is with regard to the corpus delicti. In the first place, what happened at Elmwood Court obviously demonstrated his purpose in abducting the boy, and unquestionably it was part of the res gestae. Then Timmons disappeared. Then the child was found dead, at a place Timmons was known to frequent, and to which he had expressed an intention of going just minutes before he enticed the children into the automobile. The victim's penis showed signs of trauma at some time predating his death. There was no evidence of such an injury prior to his fatal journey with Timmons. If these facts add up to murder, as we say the jury was authorized to believe, they also add up to sexual molestation. Had there been no sexual offense, there would have been no ostensible reason for the murder.

The only witnesses introduced by the defense were Marjorie Carmon and her husband, James. Mrs. Carmon testified that at 7:30 P.M. on June 19, 1975, she was sitting in her automobile in the parking lot of a grocery store not far from Elmwood Court and saw a little blonde white boy ride up on a bicycle driven by a black boy about 14 years old. She said the older boy got a popsicle for the smaller child and they drove off on the bicycle in the general direction of Elmwood Court. The white child was dressed exactly as Eddy Belt was dressed when he left Elmwood Court and when he was later found dead. Mrs. Carmon's interest was aroused especially by the

appearance of the smaller child, who was about the same age and size as her own grandson. Early the next morning she heard over the television that Eddy Belt had disappeared, whereupon she went to the Paducah police station and reported what she had seen at the grocery store the previous evening. She asked to see a picture of the missing boy, and when shown a photograph of Eddy she identified him as the child she had seen on the bicycle.

On the occasion described by Mrs. Carmon she was accompanied by her husband, her grown daughter, and a 10-year-old son. The daughter lived in Defiance, Ohio, and was visiting in Paducah. Neither she nor the son testified. James Carmon, the husband, had gone into the grocery store when the boys on the bicycle arrived and when they left, so he did not see them. He said that his wife heard about Eddy Belt's disappearance that night over television, was upset about it and went to the police the next day.

The trial of this case began on November 17, 1975. The Commonwealth rested on the afternoon of November 20, 1975, following which the trial court heard and denied motions for a mistrial based on the reception of evidence which we have already discussed and for an acquittal on both the murder and kidnapping charges. On the next morning, November 21, the defense presented the testimony of the Carmons and after a noon recess rested its case. At this point counsel for Timmons moved for a dismissal of the charges against him on the ground that the police · had withheld the exculpatory evidence of Mrs. Carmon and the defense had not learned of it until he received a tip by telephone from an anonymous caller on the previous morning as he was preparing to leave home to attend court. During the day he had an investigator work on it, and the investigator produced Mrs. Carmon that afternoon. According to defense counsel's sworn statement, he had not interviewed the Carmons before he put them on the witness stand, and he had not made contact with the daughter in Ohio. During the afternoon of November 20, however, the investigator had inter-

viewed people in the vicinity of the grocery store in an unsuccessful effort to locate other witnesses who may have seen the boys on the bicycle on the evening of June 19, 1975.

The Commonwealth's Attorney responded under oath to the effect that he had no knowledge of Mrs. Carmon until she approached his assistant during the previous afternoon and advised him of what she intended to say, whereupon the prosecutor had the city detectives bring in their files and discuss the matter with him. Their explanation was that they had made an investigation following receipt of Mrs. Carmon's report in June, during which they interviewed a black child who had been at the grocery store earlier in the afternoon of June 19, and had satisfied themselves that they could place no credence in Mrs. Carmon's report, but had neglected to bring it to the attention of the Commonwealth's Attorney.

 No one questions that under principles expressed in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1966), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the withholding by the state of information which "creates a reasonable doubt that would not otherwise exist" is a denial of due process, regardless of good faith on the part of the governmental authorities responsible for the suppression. There are two important differences, however, between those cases and this one. Here the evidence of Mrs. Carmon actually was brought to light and produced by the defense. The only known witness whose testimony was not procured was Mrs. Carmon's daughter in Ohio. What she might have said we do not know, but it could not have been any more than corroborative of what the jury heard Mrs. Carmon say. As the 10-year-old son was not mentioned, it may be assumed that he could have been interviewed promptly and secured as a witness if he had been able to provide any evidence of value. So it is the possible

corroborative testimony of the daughter that the defense claims it could have had if Mrs. Carmon's information had been made available to it at a reasonable time in advance of the trial. This contention brings us to the second major distinction mentioned above.

"When something like this happens during a trial we think counsel for the aggrieved party must exhaust all reasonably available means to have the error rectified (including, for example, a motion that the trial be recessed until the facts can be ascertained) before he can be in a position to demand a mistrial." *Romans v. Commonwealth,* Ky., 547 S.W.2d 128, 131 (1977). (It will be observed, of course, though in view of our resolution of the matter it really makes no difference now, that counsel for Timmons did not ask for a mistrial, but for a dismissal *sine die* of all the charges against him.) If this question were before us on a motion for new trial on the ground of newly discovered evidence, we would be compelled to hold that there was an insufficient showing of due diligence. Nothing is shown to suggest why counsel could not easily have reached Mrs. Carmon's daughter by telephone, and if he needed more time to look for other witnesses he should have asked the trial court to give him that opportunity through an appropriate recess of the trial. Certainly we are not at all impressed that he put Mr. and Mrs. Carmon on the witness-stand cold. That was an entirely unnecessary option on his part. As it is, the trial court had no inkling of the problem until the production of evidence had ended, though counsel had been aware of it since the day before. The record leaves this court with the decided impression that counsel deliberately chose a technical stratagem at the expense of whatever help he may have been able to get from the trial court. Not that we believe it was much of a sacrifice—there is no reason to suspect that the daughter could have added anything to what Mrs. Carmon said, or that her corroboration might have conduced to create "a reasonable doubt that would not otherwise exist." Cf. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). The long and short of it is that in our opinion there was no denial of due process.

The indictment under which Timmons was found guilty of first-degree unlawful imprisonment (KRS 509.020) charged him with the more serious felony of kidnapping (KRS 509.040). KRS 509.020 defines first-degree unlawful imprisonment as knowingly and unlawfully restraining a person under circumstances that expose him to a risk of serious personal injury. KRS 509.050, an exemption statute, provides that one may not be convicted of kidnapping or unlawful imprisonment if his criminal purpose was to commit an offense defined outside Chapter 509 "and his interference with the victim's liberty [occurred] immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose." Assaults (KRS Ch. 508), homicide (KRS Ch. 507), and sexual offenses (KRS Ch. 510) all being offenses defined outside Chapter 509, the exemption would apply in this case if (1) in detaining Eddy Belt it was the intention of Timmons to assault, kill or sexually molest him and (2) the detention occurred "immediately with and incidental to" the commission of one or more of those offenses and did not exceed "that which is ordinarily incident to the commission of such an offense." Timmons contends that the exemption does apply and that the jury should not have been given instructions authorizing his conviction of an unlawful imprisonment offense.

We have had more than a little difficulty, and some difference of opinion, in defining the exact boundaries of KRS 509.050. See, for example, *Calloway v. Commonwealth,* Ky., 550 S.W.2d 501 (1977). In retrospect, we think it might have been well for the drafters simply to omit the "unless" clause, because it is hard to see how a restraint could be "immediately with and incidental to" the commission of another offense and at the same time exceed

"that which is ordinarily incident" to the commission of such other offense. The consensus view of the court is to resolve the ambiguity in favor of the "immediately with and incidental to" phraseology, which means that the statute will be construed strictly and restrictively unless and until it be amended to the contrary. Therefore, if the victim of a crime is going to be restrained of his liberty in order to facilitate its commission, the restraint will have to be close in distance and brief in time in order for the exemption to apply. If the victim is restrained and transported any substantial distance to or from the place at which the crime is committed or to be committed, the offender will be guilty of an unlawful imprisonment offense as well. Under that criterion the exemption statute is not applicable to this case.

The remaining argument pertains to the content of the closing argument by the Commonwealth's Attorney. The legitimate scope of an argument to the jury is affected to some extent by the nature of the evidence. Outrageous conduct warrants stronger words than might otherwise be justified. We do not think that the prosecutor's argument exceeded the bounds of propriety, nor do we think that it could have added much fuel to the fire anyway.

The judgment is affirmed.

All concur.