# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED:  MARCH 23, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0424-MR

EPIONN J. LEE-MCCAMPBELL                                    APPELLANT

V.
ON APPEAL FROM MCCRACKEN CIRCUIT COURT
HONORABLE WILLIAM ANTHONY KITCHEN, JUDGE
NO. 18-CR-00660

COMMONWEALTH OF KENTUCKY                                    APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Epionn J. Lee-McCampbell appeals as a matter of right[1] from the

judgment of the McCracken Circuit Court convicting him of first-degree

manslaughter and fourth-degree fetal homicide.  He was sentenced to twenty-

five years' imprisonment.  Lee-McCampbell raises four unpreserved claims of

error:  (1) there was insufficient evidence to support the conviction for fetal

homicide; (2) the prosecutor committed misconduct during the opening

statement by making three false statements regarding anticipated evidence; (3)

the prosecutor misled the jury by eliciting testimony from a lay witness that

contradicted the testimony of an expert witness; and (4) the trial court

---

[1] Ky. Const. § 110(2)(b)

improperly admitted evidence of prior bad acts. None of these contentions merit reversal. Accordingly, we affirm the judgment of conviction and sentence.

Lee-McCampbell and the victim, Ja'Lynn Ragsdale, were dating. Their relationship was plagued by discord and abuse. On March 1, 2018, after working the night shift at McDonald's, Ragsdale went to the residence of Lee-McCampbell's mother. Lee-McCampbell and Ragsdale slept until the afternoon. Around 2:32 p.m., Lee-McCampbell called emergency services to report that Ragsdale was not breathing.

Paducah Firefighter Kurt Hanson responded first to the scene. Hanson performed chest compressions and inserted a device into Ragsdale's mouth to prevent her tongue from blocking her airway. Hanson noticed dried blood in Ragsdale's nostrils and blood in her airway. When Paramedic Justin Dinovo arrived, he discovered Ragsdale's heart was not beating. Dinovo administered epinephrine to revive her. He intubated Ragsdale and also noticed dried blood in her nostrils and blood in her airway. The paramedics transported Ragsdale to Western Baptist Hospital.

Dr. Ben Thompson treated Ragsdale at the hospital. Ragsdale was unresponsive and placed on a mechanical ventilator. Dr. Thompson observed that Ragsdale had suffered a significant brain injury. He did not believe Ragsdale had experienced a stroke, heart attack, or lung issue, which could have explained her condition. Laboratory testing revealed Ragsdale had elevated levels of human chorionic gonadotropin (HCG), which indicated she was pregnant. Dr. Thompson consulted with neurologist, Dr. Joseph Ashburn,

2

and cardiologist, Dr. Martin Raines. Dr. Ashburn confirmed Ragsdale did not experience a stroke or other medical event, which would have explained Ragsdale's condition. Dr. Raines confirmed Ragsdale did not experience a heart attack. Ragsdale's condition continued to deteriorate to the point where it was certain she would perish.

Dr. Ashburn confirmed that Ragsdale was brain-dead. Ragsdale was removed from life-support and was pronounced dead on March 4, 2018. Chief Deputy McCracken County Coroner Ben Bradford listed the cause of death as asphyxia due to suffocation and the manner of death as homicide. Chief Deputy Bradford recommended an autopsy be performed.

Dr. Christopher Kiefer performed the autopsy. Dr. Kiefer determined Ragsdale's death was caused by asphyxia due to suffocation. He concluded Ragsdale was deprived of oxygen due to an object being placed over her mouth. Dr. Kiefer also observed a nodule on Ragsdale's uterus, which indicated the early stages of pregnancy.

Lee-McCampbell made several statements to police about the circumstances leading to Ragsdale's death. Lee-McCampbell's essential story was that he and Ragsdale were play wrestling in bed when they tumbled onto the floor. When they hit the floor, Ragsdale was face down with Lee-McCampbell on top of her, holding her arm behind her back. When asked why he did not get off Ragsdale when she twice said she could not breathe, Lee-McCampbell stated he thought Ragsdale's pleas were a ruse to get the upper hand in the wrestling match. Lee-McCampbell also stated he did not know

3

how Ragsdale's hooded sweatshirt had been pulled up to cover her nose and mouth. Lee-McCampbell denied intending to hurt Ragsdale, but later told police that he took responsibility for her death.

Lee-McCampbell described his relationship with Ragsdale at length to police. He stated he and Ragsdale were trying to have a baby and he suspected Ragsdale may have been pregnant because she was showing early physical and emotional signs of pregnancy, which he recognized because Ragsdale had previously been pregnant. Lee-McCampbell recounted the tension in the relationship caused by mutual infidelities. Lee-McCampbell admitted to choking Ragsdale on two prior occasions. Lee-McCampbell also admitted to headbutting Ragsdale with such force that she required treatment at the emergency room. This incident occurred less than one month before Ragsdale's death. Additional investigation by police uncovered further incidents of abuse.

A McCracken County grand jury indicted Lee-McCampbell for murder and third-degree fetal homicide. Following a four-day trial, the petit jury found Lee-McCampbell guilty of first-degree manslaughter and fourth-degree fetal homicide. The trial court entered a judgment of conviction and sentenced Lee-McCampbell to a total of twenty-five years' imprisonment. This appeal followed.

For his first contention of error, Lee-McCampbell argues he was entitled to a directed verdict on the charge of fetal homicide. Specifically, he asserts the Commonwealth failed to prove Ragsdale was carrying an unborn child. Lee-

4

McCampbell concedes this argument was not properly preserved for appellate review and requests palpable error review under RCr[2] 10.26, which provides:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

A palpable error is "easily perceptible, plain, obvious, and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To demonstrate manifest injustice, a party must show the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). In other words, a palpable error occurs where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4. The failure to grant a directed verdict based on the insufficiency of evidence amounts to palpable error because "it is clear that a different result would occur, since a defendant convicted on insufficient proof should be acquitted." *Commonwealth v. Goss*, 428 S.W.3d 619, 627 (Ky. 2014). A conviction based on insufficient evidence necessarily results in manifest injustice. *Id.*

A trial court's failure to grant a directed verdict should not be reversed unless the appellate court determines "it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). When confronted with a motion for directed verdict, the trial court must

---

[2] Kentucky Rules of Criminal Procedure.

5

assume the truth of the Commonwealth's evidence and "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Id.* A conviction must be based on "evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 188.

Purely circumstantial evidence may support a conviction if, "based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt." *Graves v. Commonwealth*, 17 S.W.3d 858, 862 (Ky. 2000). The Commonwealth is not required to "rule out every hypothesis except guilt beyond a reasonable doubt." *Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). In other words, "the question on a directed verdict motion is not necessarily what evidence supporting the defendant was solicited, but rather what evidence the Commonwealth produced in support of its burden of proof." *Sutton v. Commonwealth*, 627 S.W.3d 836, 848 (Ky. 2021).

KRS[3] 507A.050(1) states "[a] person is guilty of fetal homicide in the fourth degree when, with recklessness, he causes the death of an unborn child." KRS 507A.010(1)(c) defines "unborn child" as "a member of the species homo sapiens in utero from conception onward, without regard to age, health, or condition of dependency." Fourth-degree fetal homicide "involves the death of an unborn child under the same circumstances as the current law for

---

[3] Kentucky Revised Statutes.

reckless homicide."  Leslie W. Abramson, *Kentucky Practice Series*, *Substantive Criminal Law*, § 4:12 (2022).  For the purposes of the Kentucky Penal Code, "[a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists."  KRS 501.020(4).

In the context of fetal homicide, the existence of an unborn child is determined in reference to the time of conception.  KRS 507A.010(1)(c).  However, KRS 507A.010 does not define the word "conception."  When construing a statute, a court's overarching duty is to effectuate the intention of the legislature.  KRS 446.080(1).  The words in a statute are to be interpreted "according to the common and approved usage of language," except for technical words, which are interpreted according to their "peculiar and appropriate meaning in the law."  KRS 446.080(4).  In Kentucky, the statutory definition of a term, "wherever it may appear in the statutes," controls elsewhere unless the context or statutory language directs otherwise.  *Camera Center, Inc. v. Revenue Cabinet*, 34 S.W.3d 39, 42 (Ky. 2000).

Kentucky's fetal heartbeat statute defines "conception" as "fertilization."  KRS 311.7701(1).  "Fertilization" means "the fusion of a human spermatozoon with a human ovum."  KRS 311.7701(3); KRS 311.781(1).  These definitions track the ordinary, legal, and medical understanding of the word "conception."  Generally, conception means "the process of becoming pregnant involving fertilization or implantation or both."  *Conception*, *Merriam-Webster's Collegiate*

7

*Dictionary* (11th ed. 2014). Legally, conception has also been defined as "[t]he impregnation of an ovum; the onset of pregnancy." *Conception, Black's Law Dictionary* (11th ed. 2019). Stated otherwise, the term is legally defined to mean the "[f]ertilization of the female ovum by the male germ cell." *Conception, Ballentine's Law Dictionary* (3rd Edition), p. 237 (citing *Am. Jur. Proof of Facts, Medical Glossary*). Medically, conception is defined as "[f]ertilization of ooccyte by a sperm." *Conception, Stedman's Medical Dictionary* (28th ed. 2006). We interpret the word "conception," as used in KRS 507A.010(1)(c), to mean fertilization, which is synonymous with the onset of pregnancy.

The Commonwealth produced sufficient evidence of conception. Dr. Thompson testified Ragsdale's initial HCG hormone levels suggested the onset of early pregnancy. He further testified that Ragsdale's HCG levels were trending upwards, which also indicated pregnancy. However, Dr. Thompson acknowledged it was very early in Ragsdale's pregnancy and she may not have known she was pregnant. Dr. Ashburn also testified HCG levels climb when a person is pregnant and Ragsdale's levels were rising. Dr. Kiefer testified he observed a nodule on Ragsdale's uterus, which indicated the early stages of pregnancy. Although Dr. Kiefer could not definitively state whether Ragsdale was pregnant, he had no other explanation for the presence of the nodule.

Beyond the Commonwealth's evidence, Lee-McCampbell's own expert, Dr. George R. Nichols, II, agreed Ragsdale was pregnant "according to the laboratory analysis." Dr. Nichols also acknowledged his prior testimony at a sworn deposition where he stated Ragsdale was pregnant. Additionally, Lee-

McCampbell testified he and Ragsdale were trying to have a baby together. Lee-McCampbell told Detective Blake Quinn that he suspected Ragsdale was pregnant because she was more emotional and her breasts and stomach had grown larger. Lee-McCampbell stated he was familiar with how Ragsdale acted when she was pregnant because she had been pregnant before.

Lee-McCampbell argues HCG evidence is not proof of fertilization. He has inappropriately cited to various medical studies and publications, which are not included in the record. We have specifically disapproved of this practice:

> Appellants' Brief is replete with citations to so-called "scientific studies" regarding the effectiveness of seat belts as safety devices. These studies were not introduced at the trial level and would not qualify as admissible evidence absent testimony as to their scientific authenticity and reliability from a credible source. Certainly our Court is not prepared to take judicial notice of the authenticity and reliability of the publications referred to in the Brief. For instance, appellants' brief refers to a "front page article in the Wall Street Journal." This was inappropriate in the brief and would be improper at trial. We disapprove of those references in the Brief to any material which was not introduced as evidence in the trial court, and point out that such material will not be admissible in the trial court unless first appropriately authenticated as a scientifically reliable source. We have disregarded this material in the Appellants' Brief in making our decision.

*Wemyss v. Coleman*, 729 S.W.2d 174, 179-80 (Ky. 1987). We also acknowledge the Commonwealth inappropriately cited to medical literature that was not presented to the trial court in an attempt to bolster Lee-McCampbell's testimony that he suspected Ragsdale was pregnant. As a reviewing court, we will not consider matters outside the record. This rule applies equally to both parties.

9

Moreover, Kentucky law does not require a criminal conviction to be supported with the degree of scientific certainty urged by Lee-McCampbell. Under the reasonable doubt standard, "that which a jury may reasonably believe to have been probable is enough to support a finding of guilt." *Timmons v. Commonwealth*, 555 S.W.2d 234, 238 (Ky. 1977). Further, Lee-McCampbell's attacks on the testimony of Dr. Thompson and Dr. Ashburn implicate assessments of the weight and credibility of evidence, which are uniquely within the province of the jury. *Ross v. Commonwealth*, 531 S.W.3d 471, 477 (Ky. 2017).

Viewing the totality of the evidence in the light most favorable to the Commonwealth, we cannot conclude it was clearly unreasonable for the jury to find conception had occurred. An appellate court is not authorized to substitute its view of the evidence for that of the jury. *Timmons*, 555 S.W.2d at 238. Therefore, there was sufficient evidence that Lee-McCampbell recklessly caused the death of an unborn child.

For his second contention of error, Lee-McCampbell argues the prosecutor committed misconduct during the opening statement by making three false statements regarding anticipated evidence. As this issue is unpreserved, Lee-McCampbell again requests palpable error review. The prosecutor's statements did not amount to flagrant misconduct.

In making its opening statement, the Commonwealth may state all the facts and circumstances which it expects in good faith to be established by the evidence. *Freeman v. Commonwealth*, 425 S.W.2d 575, 578 (Ky. 1967). It is

improper for the Commonwealth to state facts in an opening statement which it does not reasonably expect to prove from the evidence at trial. *Turner v. Commonwealth*, 240 S.W.2d 80, 81 (Ky. 1951). However, both the prosecutor and defense counsel are given wide latitude during opening and closing arguments because argument is not evidence. *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987).

When a defendant fails to make a contemporaneous objection to alleged prosecutorial misconduct, we will only reverse if flagrant misconduct rendered the entire trial fundamentally unfair. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016). To determine whether improper comments amount to flagrant prosecutorial misconduct, we must examine: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.* (quoting *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010)).

Regarding the first alleged misstatement, Lee-McCampbell argues he was prejudiced by the prosecutor's erroneous statement that Dr. Kiefer would testify he had confirmed Ragsdale's pregnancy through the observation of a fertilized egg. The prosecutor stated:

> Then I'm going to call Dr. Chris Kiefer. He is the state medical examiner. He works out of Madisonville. He conducted the autopsy. He will tell you about performing that autopsy . . . and he is going to tell you in no uncertain terms that Ja'Lynn was killed by asphyxiation, through suffocation, and that this was a homicide. He also saw a fertilized egg confirming that she was pregnant.

11

While Dr. Kiefer did not specifically testify that he observed a fertilized egg, he did testify that he observed a "nodule" on Ragsdale's uterus, which indicated she was pregnant. Dr. Kiefer was also subject to cross-examination on this topic and admitted he could not definitively state Ragsdale was pregnant. However, Lee-McCampbell's own expert, Dr. Nichols also testified Ragsdale was pregnant. Lee-McCampbell further admits the prosecutor's reference to a fertilized egg was an isolated remark. That the prosecutor's remark was isolated tends to diminish any possibility of bad faith or deliberate deception. While the conviction for fetal homicide was largely based on circumstantial evidence, given the evidence as a whole, we cannot conclude the prosecutor's comment amounted to flagrant misconduct. The error, if any, was harmless.

Regarding the second alleged misstatement, Lee-McCampbell argues he was prejudiced by the prosecutor's erroneous statement that Autumn Stefanick would testify Lee-McCampbell had choked Ragsdale on several prior occasions. Regarding the prior choking incidents, the prosecutor stated:

> I'm going to call to Autumn Stefanick, a friend of Ja'Lynn's, who is going to testify that she was present on February 18th, less than two months before Epionn killed Ja'Lynn, and that she called the police in an attempt to stop him from being violent with her. She'll testify that she's personally witnessed the defendant choke Ja'Lynn on several occasions.

Stefanick did not testify she witnessed Lee-McCampbell choke Ragsdale on several occasions. Stefanick testified concerning a single altercation between Lee-McCampbell and Ragsdale where Lee-McCampbell had violently pinned Ragsdale to the floor. Stefanick was subject to cross-examination. Another

12

witness, Ardajaha Clark, testified she witnessed Lee-McCampbell wrap his arms around Ragsdale's neck hard enough that Ragsdale said she could not breathe. Lee-McCampbell himself admitted on direct examination that he had previously choked Ragsdale on two occasions. He admitted having multiple violent arguments with Ragsdale. The remark regarding Stefanick's expected testimony was isolated and we do not discern any bad faith on the part of the prosecutor. Given the evidence as a whole, including Lee-McCampbell's own admissions, we cannot conclude the Commonwealth's failure to elicit the anticipated evidence from Stefanick amounted to flagrant misconduct.

Regarding the third alleged misstatement, Lee-McCampbell argues the prosecutor committed flagrant misconduct by stating that Ragsdale's sister, Erica Leggs, would testify she witnessed Lee-McCampbell punch Ragsdale. The prosecutor did not call Leggs to the stand during the guilt phase, although Leggs did testify during the penalty phase. Lee-McCampbell has failed to demonstrate the prosecutor acted in bad faith by failing to call Leggs to the stand. Lee-McCampbell could have mitigated any possible prejudice during closing argument by indicating the Commonwealth failed to produce the evidence described in its opening statement. We cannot conclude the prosecutor committed flagrant misconduct.

For his third allegation of error, Lee-McCampbell argues the Commonwealth unfairly misled the jury by eliciting testimony from a lay witness that contradicted the testimony of an expert witness. Lee-McCampbell asserts the Commonwealth unfairly placed the jury in a situation where it

13

would be forced to believe a police officer over a medical doctor. As this argument is unpreserved, we will again review for palpable error.

Sergeant Travis Watson testified he observed petechiae in Ragsdale's eyes. Petechiae is the plural form of petechia, which means "a minute reddish or purplish spot containing blood that appears in skin or mucous membrane as a result of localized hemorrhage." *Petechia*, *Webster's Third New International Dictionary Unabridged* (1993). However, Dr. Kiefer, the medical examiner, testified that he did not observe any petechiae on Ragsdale's body.

Lee-McCampbell does not claim Sgt. Watson's testimony about petechiae was inadmissible. He simply speculates about the weight and credibility the jury assigned to this evidence. It is well-established that "a jury is free to believe the testimony of one witness over the testimony of others." *Minter v. Commonwealth*, 415 S.W.3d 614, 618 (Ky. 2013). When a jury is presented with competent evidence, we "will not invade the jury's province to weigh conflicting evidence, judge the credibility of witnesses and draw the ultimate conclusion." *Clark v. Commonwealth*, 567 S.W.3d 565, 569-70 (Ky. 2019). We cannot discern any error concerning the conflicting evidence, much less palpable error.

For his fourth contention of error, Lee-McCampbell argues the trial court erred by allowing improper evidence of prior bad acts. He asserts this argument is "partially preserved," because he made "a blanket objection to relevance and that the probative value was outweighed by prejudice." Upon review of the record, we conclude the alleged error was not properly preserved.

14

Prior to trial, the Commonwealth provided Lee-McCampbell notice of its intent to produce evidence of multiple prior incidents of abuse that Lee-McCampbell had inflicted upon Ragsdale. Pertinent to the present appeal, the Commonwealth stated that it would present evidence that Lee-McCampbell had pulled a gun on Ragsdale and some of her friends on December 29, 2017, less than three months before Ragsdale's death. Lee-McCampbell filed a response objecting to the introduction of any evidence of prior bad acts. However, Lee-McCampbell did not specifically address the gun incident at the hearing on the motion in limine or otherwise object to the introduction of the evidence at trial. A generic objection to any evidence of prior bad acts is insufficient to preserve an error for review. *Lanham v. Commonwealth*, 171 S.W.3d 14, 21 (Ky. 2005). Nevertheless, we will review for palpable error as alternatively requested by Lee-McCampbell.

While evidence of prior bad acts is generally inadmissible to prove a defendant's criminal predisposition, KRE 404(b) "specifically provides for the admission of prior bad act evidence to show the absence of an accident." *Driver v. Commonwealth*, 361 S.W.3d 877, 885 (Ky. 2012). In *Driver*, the defendant brutally beat and attempted to strangle his wife with a belt. At trial, the wife attempted to minimize the defendant's culpability and testified that most of her physical injuries were the result of yard work and "wrestling." The Commonwealth was permitted to introduce, over the defendant's objection, evidence the defendant had previously threatened his wife with a knife and committed other acts of abuse. The defendant was ultimately convicted of first-

degree assault. This Court recognized that evidence of prior abuse and threats by the defendant against the victim is generally relevant and admissible "to prove the absence of accident or mistake when he subsequently killed her." *Id.* (quoting *Moseley v. Commonwealth*, 960 S.W.2d 460, 461 (Ky. 1997)). In such circumstances, neither the temporal remoteness of the prior abuse nor differences in the method of abuse necessarily negate the relevance and admissibility of the evidence. *Id.*

Lee-McCampbell's theory of the case was that Ragsdale's death was caused by accident while they were "play wrestling." Under *Driver*, evidence that Lee-McCampbell previously threatened Ragsdale with a gun is admissible to prove the absence of an accident. *Id.* at 885. In the present appeal, the prior threat occurred close in time to Ragsdale's death. Although Lee-McCampbell was not charged with the use of a gun in connection with Ragsdale's death, the admissibility of evidence to prove the absence of accident does not depend on substantial similarity. Lee-McCampbell further argues the testimony concerning the gun incident was not corroborated by any other evidence. However, we discern no requirement that evidence under KRE 404(b) requires independent corroboration. The admission of this evidence did not amount to palpable error.

For his fifth and final contention of error, Lee-McCampbell argues that his conviction should be reversed because of cumulative error. We disagree. Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to

16

render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). The only possible error we identified was the unpreserved allegation of prosecutorial misconduct where the prosecutor referenced evidence of a fertilized egg during the opening statement, which was not produced at trial. However, given the totality of the evidence, the statement did not rise to the level of prejudice required to find palpable error. In the absence of a single instance of prejudicial error, we cannot find cumulative error warranting reversal. *Id.*

For the foregoing reasons, the judgment of the McCracken Circuit Court is affirmed.

All sitting. VanMeter, C.J.; Conley, Lambert, Nickell, JJ., concur. Bisig, Keller, Thompson, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Jennifer Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Michael R. Wadja
Assistant Attorney General

17